UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JOHN SINCLAIR, ALLAN STRAUGHN, | : | |
| AND DOLLIE STRAUGHN, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| | : | |
| v. | : | NO. 1:11-CV-00010 |
| | : | |
| | : | |
| SHAUN DONOVAN, et al., | : | |
| | : | |
| Defendants. | : | |
| ――――――――――――――― | : | **OPINION AND ORDER** |
| | : | |
| BAC HOME LOAN SERVICING, LP | : | |
| f/k/a Countrywide Home Loans | : | |
| Servicing LP, | : | |
| | : | |
| Plaintiff/Counterclaim | : | |
| Defendant | : | NO. 1:11-CV-00079 |
| | : | |
| v. | : | |
| | : | |
| T.J. EVANS, et al., | : | |
| | : | |
| Defendants/Counterclaim | : | |
| Plaintiffs/Cross-claim | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| SHAUN DONOVAN, et al., | : | |
| | : | |
| Cross-claim Defendants | : | |

This matter is before the Court on the Motion to Dismiss of Shaun Donovan, Secretary of the United States Department of Housing and Urban Development, David Stevens, Assistant Secretary of the United States Department of Housing and Urban Development, and the United States Department of Housing and Urban Development

(together, the "Government Defendants") (doc. 24), as well as the Motion to Dismiss of Defendants Bank of America, N.A. and BAC Home Loans Servicing, LP (together, the "Lender Defendants") (doc. 22) and their accompanying Memorandum in Support (doc. 23) (including their Notice of Supplemental Authority in Support (doc. 31)),[1] and the respective responsive memoranda, specifically Plaintiff Homeowners' Response in Opposition to Government Defendants' Motion (doc. 34) and Government Defendants' Reply in Support (doc. 40) and Plaintiff Homeowners' Response in Opposition to Lender Defendants' Motion (doc. 35) and Lender Defendants' Reply in Support (doc. 39).[2] Oral argument was held on August 17, 2011.  For the reasons that follow, the Court GRANTS the Government Defendants' motion (doc. 24) and GRANTS in part and DENIES in part the Lender Defendants' motion (doc. 22).

---

[1] Also pending on the Court's docket is the Lender Defendants' Motion to Dismiss Plaintiff Sinclair's original complaint (doc. 10) and their accompanying Memorandum in Support (doc. 11) and Plaintiff Sinclair's Response in Opposition (doc. 16).  The issues raised in these pleadings are encompassed within the subsequently filed Lender Defendants' Motion to Dismiss Amended Complaint (doc. 22), now before the Court.  Hence, our ruling on this latter motion directed to the amended complaint resolves the issues raised in the first instance by Lender Defendants' in their Motion to Dismiss the original complaint.

[2] In addition, pending before the Court in the Evans case is the Lender Defendants' Motion to Dismiss the counterclaims filed by homeowners (doc. 5, No. 1:11-CV-00079) and the Government Defendants' motion to dismiss the cross-claim filed by homeowners (doc. 29, No. 1:11-CV-00079).  These motions were filed prior to this Court's Opinion and Order (entered May 13, 2011) consolidating these cases (doc. 26; doc. 31, No. 1:11-CV-00079).

## I. Background

These consolidated cases arise out of circumstances surrounding properties owned by the Sinclair Plaintiffs and the Evans Defendants/Counterclaim Plaintiffs/Cross-claim Plaintiffs, each with loans serviced by the Lender Defendants and insured by the Government Defendants.  In sum, according to the First Amended Complaint in the Sinclair case (doc. 12), and the Complaint in Foreclosure (doc. 2, No. 1:11-CV-00079) and the Amended Answer, in which the homeowners asserted counterclaims against their lender and cross-claims against the Secretary and HUD (doc. 4, No. 1:11-CV-00079) in the Evans case, the homeowners fell behind in their mortgage payments.  In January 2009, the Sinclair loan was accelerated and his lender filed for foreclosure in the Hamilton County Court of Common Pleas the following August.  That foreclosure proceeding was voluntarily dismissed in December 2009, but the loan remains accelerated.  Likewise, in October 2009, the Straughn loan was accelerated, but no foreclosure proceedings against them have been commenced.  In May 2010, foreclosure proceedings were filed against the Evans homeowners in the Highland County Court of Common Pleas, which, in February 2011, was removed to this Court (doc. 1, No. 1:11-CV-00079).  See 28 U.S.C. §§ 1441, 1442(a).

Both cases raise the following claims by the homeowners: (i) that the Government Defendants and the Lender Defendants

violated their due process rights by not providing adequate notice and an opportunity to be heard regarding loss mitigation; (ii) that the Lender Defendants breached their contract with the homeowners by accelerating their loans without first complying with HUD-FHA regulations concerning loss mitigation options that were incorporated into the contracts; (iii) that the Lender Defendants breached their fiduciary duty to the homeowners by failing to process properly the paperwork submitted for loss mitigation and by engaging in unreasonable and arbitrary conduct with respect to the homeowners' accounts; (iv) that the Lender Defendants breached the covenant of good faith and fair dealing by not promptly and reasonably evaluating the homeowners for their eligibility for loss mitigation options; and (v) that the Lender Defendants are liable to the homeowners for infliction of emotional distress by improperly servicing the homeowners' loans in a manner that intentionally, recklessly, knowingly, and/or negligently caused the homeowners emotional distress. The First Amended Complaint in the Sinclair case additionally seeks injunctive relief against the Government Defendants on behalf of a class of persons defined as "[a]ll Ohio homeowners with HUD-FHA loans covered by the FHA Loss Mitigation Program" (doc. 12, at 16).

The motions to dismiss detailed above were filed, and the issues were briefed extensively by counsel and argued before the Court. They are ripe now for disposition, and the Court will

address each in turn.

## II.  The Government Defendants' Motion

In their motion to dismiss, the Government Defendants argue that, pursuant to Federal Rule of Civil Procedure 12(b)(1), the Court lacks subject matter jurisdiction over the single claim alleged against them and that, pursuant to Federal Rule of Civil Procedure 12(b)(6), the amended complaint fails to state a claim upon which relief may be granted (doc. 24).  Specifically, the Government Defendants assert that the Plaintiff Homeowners lack standing to bring the claim alleged against them and, therefore, Article III jurisdiction does not exist.  Even if jurisdiction attaches, however, the Government Defendants assert that the Plaintiff Homeowners fail to set forth sufficient facts in their amended complaint from which the Court either plausibly could infer state action or the existence of a protected property interest, both requisites for a Fifth Amendment claim.  We address, as we must, the Government Defendants' jurisdictional challenge first.

Article III, Section 1 of the Constitution of the United States limits federal court jurisdiction to "Cases" and "Controversies," and "the core component of standing" remains a constant in the analysis.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  The "irreducible constitutional minimum of standing" requires study of whether each of three particular elements have been satisfied.  Id. at 560-561.  Plaintiffs must

establish that they have suffered an "injury-in-fact," specifically, compromise of a concrete, protected interest that is actual, rather than conjectural, and imminent, rather than hypothetical. Next, the injury-in-fact must be sufficiently connected to the conduct of which Plaintiffs complain, such that it is "fairly trace[able]" to Government Defendants' actions. Finally, it must be likely, rather than speculative, that a decision favorable to Plaintiffs will redress their injury-in-fact. Id. (citing Allen v. Wright, 468 U.S. 737, 751, 756-57 (1984); Whitmore v. Arkansas, 495 U.S. 149, 155-56 (1990); Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 37-38, 41-43 (1976). "This triad . . . constitutes the core of Article III's case-or-controversy requirement . . . ." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 103 (1998). All three "tests" of standing--injury-in-fact, causation, and redressability--must be satisfied. Id. at 103, 105. Applying this analysis, the Court agrees with the Government Defendants that the Plaintiff Homeowners cannot establish the necessary three elements and therefore lack standing to bring suit against them.

The injury-in-fact claimed by the Plaintiff Homeowners is one for Fifth Amendment procedural due process rights. They assert that they have a property right in the FHA Loss Mitigation Program such that their lender is required to evaluate their mortgages for applicability of mitigation options immediately before (or at)

-6-

default to avoid foreclosure.  They do not claim they are entitled to grant of a _specific_ mitigation option.  Rather, before their mortgage loans are accelerated, they claim they are entitled to consideration _generally_ of any and all mitigation options delineated within or otherwise allowed by the Program.  They further assert that they were deprived of this right without notice or an opportunity to be heard.

Congress created the Federal Housing Administration's ("FHA") Single Family Insured Loan program "to meet the housing needs" of low-to-moderate income borrowers.  12 U.S.C. § 1708(a)(7).  To entice mortgagee banks to make loans to such borrowers, the FHA Insured Mortgage Program ("Program") provides insurance to cover losses incurred by them in the event of borrower default and subsequent foreclosure.  A mortgagee bank that experiences a loss because of foreclosure can be made whole by proceeds paid out from an insurance claim filed with the Secretary of Housing and Urban Development ("HUD").  Id. §§ 1709(a); _see_ _id._ §§ 1710(a)(1), 1715u(b).  Only "approved" mortgagees may originate or hold HUD-FHA mortgages.  Id.  § 1709(b)(1).  If default is imminent or has occurred, a mortgagee "shall engage in loss mitigation actions for the purpose of providing an alternative to foreclosure . . . ."  Id. § 1715u(a) (emphasis added).  A mortgagee "must consider the comparative effects of their elective servicing actions, and must take those appropriate actions which can

reasonably be expected <u>to generate the smallest financial loss to the Department [of Housing and Urban Development]</u>." 24 C.F.R. § 203.501 (emphasis added).  Specific options are itemized, among them, deeds in lieu of foreclosure under § 203.357, pre-foreclosure sales under § 203.370, partial claims under § 203.414, assumptions under § 203.512, special forbearance under § 203.417 and § 203.614, and recasting of mortgages under § 203.616.  <u>Id.</u>

The language emphasized makes clear that the loss mitigation provisions are intended to benefit the Government as provider of the insurance.  While it is true that the Plaintiff Homeowners also might benefit, this collateral effect does not confer a legally protected procedural due process interest on them.  And absent such an interest, the Plaintiff Homeowners cannot establish they have suffered the requisite "injury-in-fact."

As a policy matter, Plaintiffs urge that the purpose of loss mitigation must be to assist borrowers rather than to subsidize lenders or to protect the public fisc.  Any other result would be counter-intuitive to the stated purpose of the National Housing Act, 12 U.S.C. § 1701 <u>et seq.</u>, enacted to achieve a Congressional housing policy "of a decent home and suitable living environment for every American family." 42 U.S.C. § 1441. Yet, as detailed above, the wording of the regulations undercuts this theory.  Moreover, the Court does not consider the goal of protecting the public fisc to be incongruous with that of ensuring

the opportunity for housing for FHA-eligible borrowers.  Indeed, these borrowers are the ultimate beneficiaries of a <u>status quo</u> in which    FHA-approved    lenders    are    confident    in    the    federal government's ability to operate a viable and sustainable program.

Likewise, the Plaintiff Homeowners cannot establish that the failure of the Lender Defendants to consider loss mitigation options is "fairly trace[able]" to the Government Defendants.  The same statutory references that prompt our conclusion of no "injury-in-fact" also direct that we find a lack of causation  and thus a failure to satisfy the second test of standing.  Again, if default is imminent or has occurred, "<u>mortgagees shall engage</u> in loss mitigation actions for the purpose of providing an alternative to foreclosure . . . ."  12 U.S.C. § 1715u(a) (emphasis added). "<u>Mortgagees must consider</u> the comparative effects of <u>their</u> elective servicing actions, <u>and must take</u> those appropriate actions which can reasonably be expected to generate the smallest financial loss to  the  Department."   24  C.F.R.  §  203.501  (emphasis  added). Moreover, "<u>[t]he Secretary may</u> establish a program for assignment [of a mortgage] to the Secretary, <u>upon request of the mortgagee</u> . . . ." (12 U.S.C. § 1715u(c)(1)(A) (emphasis added)), but is not obligated under the statute either "to provide an alternative to foreclosure  for  mortgagees  with  mortgages  [insured  under  the Program] . . . or to accept assignment of such mortgages" (<u>id.</u> § 1715u(f) (emphasis added)).  So while HUD may choose to accept what

a mortgagee proposes with respect to an individual mortgage, it has no authority to compel a mortgagee to follow a particular course, even if the loss mitigation mandate has been ignored.  Rather, under the statutory scheme, HUD is left only with one of two alternatives by way of sanction against the  mortgagee.  It can impose a civil money penalty[3] or revoke its designation of the mortgagee as an FHA-approved lender.  See 24 C.F.R. § 203.500.  HUD specifically may not deny insurance benefits to a non-compliant mortgagee.  Id.  Given these legislative parameters, any failure by the Lender Defendants to afford the Plaintiff Homeowners an opportunity to be considered for loss mitigation options cannot be attributed to the Government Defendants.

Ammex, Inc. v. United States, 367 F.3d 530 (6th Cir. 2004) is instructive.  Plaintiff Ammex operated a duty-free store next to the Ambassador Bridge in Detroit, Michigan, which connects the United States and Canada.  Designation as a duty-free enterprise, officially known as a "sterile" United States Customs Class 9 bonded warehouse, allowed Ammex to sell for export certain

---

[3]Failure to engage in loss mitigation may draw a maximum penalty of "three times the amount of the total mortgage insurance benefits claimed by the mortgagee with respect to any mortgage for which the mortgagee failed to engage in such loss mitigation actions." 24 C.F.R. § 30.35(c)(2).  Without question, imposition of such a potentially large fine further supports our inference, drawn in Part II of this Opinion and Order, that the loss mitigation provisions are intended to benefit the Government as provider of the insurance and not the homeowner as mortgagor.

goods, duty-free, to customers, who, upon exiting the store, have no choice but to continue on to Canada. Ammex wished to sell gasoline and diesel fuel on a duty-free basis as well, and asked its suppliers to purchase the fuel without paying the federal excise tax. The suppliers refused on the authority of 28 U.S.C. § 4081(1)(A)(ii), which places the attachment of the tax at the point when the fuel leaves the terminal rack for delivery to Ammex's fuel dispensing tanks. Ammex challenged imposition of the tax under the Export Clause of the United States Constitution (art. 1, § 9, cl. 5), the federal customs law that confirms the constitutional proscription (19 U.S.C. § 1555(b)(3)(C), (8)(E)), and provisions within the Internal Revenue Code. Ammex sought refund claims from the Internal Revenue Service ("I.R.S.") for the excise tax imposed plus interest, which were disallowed. Ultimately a complaint was filed in federal district court against the United States and the I.R.S. There the trial judge granted the Government's motion for summary judgment and denied Ammex's, ruling that Ammex could not establish an "injury-in-fact" and therefore lacked standing to seek a refund. 367 F.3d at 532-33. The Sixth Circuit affirmed:

> Although the Government did impose an excise tax on the fuel that Ammex purchased and later sold at its 'duty-free facility,' that tax was not assessed against Ammex. Instead, the tax was imposed on Ammex's suppliers who, in turn, added the amount of the tax to the wholesale price of the fuel Ammex purchased (footnote omitted). . . . Therefore, Ammex did not pay the challenged excise tax to the Government (nor was such a

<u>tax assessed against it),</u> but instead paid a tax-included price to its suppliers. . . . Consequently, <u>any alleged injury suffered</u> by Plaintiff in the form of increased fuel costs <u>was not occasioned by the Government.</u>

<u>Id.</u> at 534 (emphasis added). Lacking "an injury-in-fact, caused by the Government," the Sixth Circuit ruled that Plaintiff Ammex had no standing to pursue its claim under the Export Clause. <u>Id.</u>

A similar result must obtain here. The injury alleged by the Plaintiff Homeowners was "not occasioned" by the Government Defendants, but rather by the Lender Defendants. It is the Lender Defendants with whom the Plaintiff Homeowners have a direct relationship, and any failure of the Lender Defendants to provide access to loss mitigation options is not fairly traceable to the Government Defendants, which have the statutory power only to fine the lender mortgagees or exclude them from participation in the Program. The homeowners, therefore, not only cannot establish the first component of the "irreducible constitutional minimum of standing," namely injury-in-fact, but they also cannot meet the second equally necessary requirement of causation.

Because the Plaintiff Homeowners have failed to establish their standing to sue the Government Defendants, our inquiry must end. <u>Simon</u>, 426 U.S. at 37. "The case-or-controversy doctrines state fundamental limits on federal judicial power in our system of government. The Art. III doctrine that requires a litigant to have 'standing' to invoke the power of a federal court is perhaps the most important of these doctrines." <u>Allen</u>, 468 U.S. at 750-51.

-12-

Absent standing, we have no jurisdiction to proceed  further with respect to the single claim that the homeowners, as  plaintiffs in the lead Sinclair case and as cross-plaintiffs in the consolidated Evans case, have brought against the Government Defendants. Accordingly, pursuant to Federal Rule of Civil Procedure 12(b)(1), the Government Defendants' Motion to Dismiss (doc. 24) is hereby GRANTED.[4]

### III. The Lender Defendants' Motion

While only a single claim was alleged by the homeowners against the Government Defendants, as enumerated above, a total of five are alleged by them against the Lender Defendants.  In their comprehensive motion to dismiss, the Lender Defendants argue that, pursuant to Federal Rule of Civil Procedure 12(b)(6), the First Amended Complaint in its entirety fails to state a claim upon which relief may be granted.

In Bell Atlantic Corp. v. Twombly, the Supreme Court retired the half-century-old pleading standard of Conley v. Gibson that a claim should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Twombly, 550 U.S. 544, 546 (2007)(citing Conley v. Gibson, 355 U.S. 41, 45-46

---

[4]Our ruling similarly grants the Government Defendants' pending motion to dismiss the cross-claim filed by homeowners in the Evans case (doc. 29, No: 1:11-CV-00079) before it was consolidated with the lead Sinclair case (doc. 31, No: 1:11-CV-00079), as the question presented is identical.

(1957)(emphasis added)).  Federal Rule of Civil Procedure 8(a)(2)
"demands more than an unadorned, the-defendant-unlawfully-harmed-me
accusation."  Kline v. Mortgage Electronic Security Systems, 659
F.Supp.2d 940, 945 (S.D. Ohio 2009)(quoting Ashcroft v. Iqbal, 129
S. Ct. 1937, 1949 (2009)).  A pleading is insufficient if it only
offers "a formulaic recitation of the elements of a cause of
action" or tenders nothing more than "labels and conclusions."
Twombly, 550 U.S. at 555.  A complaint must "state a claim to
relief that is plausible on its face" or risk dismissal.  Iqbal,
129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570).  While a
court must accept as true all of the factual allegations of the
complaint, it is not so bound with regard to legal conclusions,
particularly when couched as the former.  Iqbal, 129 S. Ct. 1949-50
(citing Twombly, 550 U.S. at 555 (citing Papasan v. Allain, 478
U.S. 265, 286 (1986))).  Guided by this standard, an analysis of
each claim follows.

### A.  Denial of Due Process

Plaintiffs' first claim for relief asserts that they
"have an entitlement to the benefits of the FHA Loss Mitigation
Program" (First Amended Complaint ¶ 100, doc. 12 at 17), that HUD
delegated to the Lender Defendants "the authority for determining
whether a borrower is eligible for loss mitigation options" (id.
¶ 102), that the Program is "a shared undertaking of the federal
government and [the Lender Defendants]" such that, "in making

-14-

decisions under the [] Program, [the Lender Defendants are] acting under the color of law" (id. ¶ 103, doc. 12 at 18), and that the Lender Defendants failed to provide the homeowners "with sufficient notice of [their] adverse decisions regarding loss mitigation" (id. ¶ 107) and "with an opportunity to be heard on their reasons for disputing [the Lender Defendants' adverse] decision[s]" (id. ¶ 108), all in violation their rights to due process under the Fifth Amendment (id. ¶ 109).

Having granted the Government Defendants' motion to dismiss the procedural due process claim alleged against them in Part II of this Opinion and Order, we must make the same ruling with respect to the Lender Defendants. We found that the Plaintiff Homeowners lacked standing to bring suit against against the Government Defendants because the loss mitigation provisions they reference are intended to advantage the Government as the provider of the mortgage insurance. Any ancillary benefit the Plaintiff Homeowners might enjoy does not confer a legally protected procedural due process interest on them. For this reason, we concluded that Plaintiffs could not establish the requisite "injury-in-fact" that would allow them to continue to proceed against the Government Defendants. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

Without a due process interest, no claim under the Fifth Amendment can be made. Morrissey v. Brewer, 408 U.S. 471, 481

-15-

(1972) ("The question is . . . whether the nature of the interest is one within the contemplation of the 'liberty or property' language . . . ." Concededly, the determination of whether nominally private conduct is actually government action is "'necessarily [a] fact-bound inquiry.'" <u>Brentwood Academy v. Tennessee Secondary School Athletic Ass'n</u>, 531 U.S. 288, 298 (quoting <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 939 (1982). But when the conduct at issue, based on a plain reading of the statute and regulations, is prescribed to advantage the Government itself,[5] a private citizen cannot claim for himself a lack of constitutionally guaranteed due process and seek to hold responsible a purported state actor. Accordingly, Rule 12(b)(6) requires dismissal of Plaintiffs' claim for denial of due process.[6]

## B. Breach of Contract

Plaintiffs' second claim for relief asserts that the Lender Defendants accelerated their loans without complying "with HUD-FHA regulations incorporated in [their mortgage] contract, which include, but are not limited to [regulations] . . . regarding

---

[5] <u>See, e.g.</u>, 24 C.F.R. § 203.501 (A mortgagee "<u>must</u> take those appropriate actions which can reasonably be expected <u>to</u> <u>generate the smallest financial loss to the Department [of</u> <u>Housing and Urban Development]</u> (emphasis added).).

[6] Our ruling similarly grants the Lender Defendants' pending motion to dismiss the denial of due process counterclaim filed by homeowners in the Evans case (doc. 5, No: 1:11-CV-00079) before it was consolidated with the lead Sinclair case (doc. 31, No: 1:11-CV-00079), as the question presented is identical.

loss mitigation options and minimum loss to the government; . . . regarding face-to-face meetings; . . . regarding periodic evaluations for loss mitigation; . . . regarding FHA-HAMP; . . . regarding loan modifications" (First Amended Complaint ¶ 112, doc. 12 at 19). They further assert that they "have suffered emotional distress and financial damage" as a result (id. ¶ 113). The Lender Defendants maintain that this claim is insufficiently pled as it does not allege two of the four "critical elements necessary for a breach of contract claim" (doc. 23 at 8), specifically performance by the Plaintiff Homeowners and damages resulting from the breach. Additionally, they urge that the reference to HUD regulations in these mortgages "does not mean that they are incorporated as enforceable contract terms" (doc. 39 at 3 (emphasis added)). We disagree in both instances.

　　　　To prevail on a breach of contract claim, Ohio law demands proof of four elements: (1) existence of a contract; (2) performance by plaintiff; (3) breach by defendant; and (4) damage or loss to plaintiff. Osborn Engineering Co. v. K/B Fund IV Cleveland, L.L.C., No. 95157, 2011 WL 365593 ¶ 10 (Ohio App. 8 Dist. Jan. 27, 2011). This standard is not disputed by the parties. Rather, the Lender Defendants argue that, because the Plaintiff Homeowners fell behind in their mortgage payments, they cannot claim that they have "performed" as required under the law. Citing a recent state court decision in a case to which they were

-17-

a party, the Lender Defendants urge us to adopt the reasoning of the trial judge who concluded, "[t]his court can not conceive of any more material or fundamental obligation of a borrower/mortgagor under a note and mortgage than payment of the monthly amount due pursuant to the terms of the contract.  The failure to make the agreed upon payments . . . is at the very heart or purpose of the contract."  <u>BAC Home Loans Servicing, LP, v. Karner</u>, No. CV2010 02 0931, slip op. at 9-10 (Court of Common Pleas, Butler County, Ohio, May 5, 2011) (doc. 31, Exhibit A).  We are not bound by this ruling on what constitutes mortgagor performance, however,  as it is one handed down  by a lower court.  Until  the Ohio Supreme Court reaches this issue, we are at liberty to make our own informed decision.  <u>See</u> <u>Clark v. Chubb Group of Ins. Cos.</u>, 337 F.3d 687, 695 (6th Cir. 2003); <u>Charney v. Thomas</u>, 372 F.2d 97, 99 (6th Cir. 1967).

We turn to other federal district courts for guidance. On a similar Rule 12(b)(6) motion to dismiss, following Fourth Circuit law, the trial judge in <u>Kersey v. PHH Mortgage Corp</u>. ruled that the NHA does not create an express or implicit private cause of action  when a mortgagor believes that his lender has proceeded to foreclosure in violation of the FHA regulations specifically incorporated into the mortgage contract.  682 F.Supp.2d 588, 592-93 (E.D. Va. 2010).  The mortgagor conceded as much there (<u>id</u>. at 593), as do the Plaintiff Homeowners here (Homeowners' Response in

Opposition to Bank of America's Motion to Dismiss the Amended Complaint, doc. 35 at 4). But the judge also was persuaded that a "mortgagee's failure to comply with the [FHA] regulations made part of the parties' agreement could give rise to liability on a contract theory because the parties incorporated the terms into their contract." 682 F.Supp.2d at 596.[7] See Baker v. Countrywide Home Loans, Inc., 2009 WL 1810336 *5 (N.D. Tex. June 24, 2009)("[A] failure to comply with the [HUD] regulations made part of the parties' agreement may give rise to liability on a contract theory because the parties incorporated the terms into their contract."). In Kersey, the issue of mortgagor performance was not before the court as it is here. We adopt the dictum in that case, however, as our ruling in this one:

> The Plaintiff alleges that she 'fell into arrears on the note.' Pl's Compl. ¶ 8. Neither party has alleged that, in doing so, the Plaintiff committed a 'material breach' of the parties' contract such that the Defendant

---

[7]Indeed, the state trial judge in Karner concurred with this finding in Kersey. In the case before him, Judge Pater noted, "the FHA-HAMP regulations were incorporated into the parties' contract through the specific language used in the note and mortgage. The fact that these may be HUD form documents that BAC is required to use is of no consequence. Karner's counterclaims survive BAC's motion to dismiss on the basis that she is attempting to bring a prohibited private action under FHA-HAMP." Karner, slip op. at 6-8. This ruling rings hollow, however, in light of Judge Pater's additional determination concerning the mortgagor's lack of performance. The FHA regulations at issue are triggered only upon default, so, under this analysis, a breach of contract claim never would survive a motion to dismiss. As the ensuing body of this opinion makes clear, we consider this result untenable as it allows a mortgagor no direct recourse against its lender.

was excused from its obligation to perform under the contract. Indeed, <u>the fact that the contract specifically contemplates the Plaintiff falling into arrears by imposing obligations on the Defendant to do certain things in the event of arrearage prior to commencing foreclosure</u>--such as having a face-to-face meeting with the mortgagor--<u>suggests that simply falling into arrears on the note is not a material breach.</u>

<u>Id.</u> at 597 (emphasis added). As the Plaintiff Homeowners contend (doc. 16 at 12-13), it indeed would be an absurd result if the Lender Defendants were allowed to ignore the contract terms drafted to govern their post-default conduct on the grounds that the mortgagors have defaulted. We find that the HUD-FHA regulations concerning loss mitigation are enforceable terms of the mortgage contract between the parties and that Plaintiffs cannot be denied the benefit of these provisions by virtue of the fact of simple default.

This Court finds further that the Plaintiff Homeowners sufficiently have alleged damages, the fourth required element of their breach of contract claim. Defendants urge, with respect to the "financial damage" (First Amended Complaint ¶ 113, doc. 12 at 19) averred, that we dismiss because there are no pending foreclosure actions and because any alleged "improper" fees charged and interest accrued thereon[8] have not yet been paid by Plaintiffs.

---

[8]The Lender Defendants accurately observe that the claim of "improperly charge[d] interest and fees" (doc. 35 at 12) does not appear in the First Amended Complaint (doc. 12 ¶ 113), but rather in the Plaintiff Homeowners' memorandum in opposition (doc. 35). Given the issues at bar, we do not consider this discrepancy in any way significant.

We find this argument specious.  To live with the daily trauma of the imminent foreclosure and loss of one's home, along with the consequent result of compromised credit, comes well within the ambit of "financial damage."    We also reject the Lender Defendants' (more plausible) contention that damages for alleged emotional distress typically cannot be recovered in a breach of contract claim and, as a matter of law, should not be allowable in the case before us.

The Ohio Supreme Court has answered affirmatively the question of whether emotional distress damages can be recovered in a breach of contract action in which it was found that a defendant construction company breached its warranty of good workmanship owed to its plaintiff buyer. Kishmarton v. William Bailey Construction, Inc., 93 Ohio St. 3d 226, 754 N.E.2d 785 (2001).  Relying on the state constitution, the court noted, "[e]motional distress injuries are injuries for which our [c]onstitution guarantees a right to a remedy.  Further, it is reasonable to allow emotional distress damages because some contract breaches cause them."  Id. at 229, 754 N.E.2d at 788 (construing Ohio Const. art. I, § 16). Continuing, the court limited recovery for emotional distress to the circumstance in which "the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result."  Id. at 230, 754 N.E.2d at 788 (quoting Restatement (Second) of Contracts § 353

-21-

(1981)).  With these tenets as support, the <u>Kishmarton</u> court ruled that it was joining the "minority of courts that allow emotional distress damages in contract cases involving transactions between [home buyers] and [home builders] . . . . <u>Id.</u> at 230, 754 N.E.2d at 788.

The Lender Defendants correctly note that the referenced comment to the Restatement suggests "contracts for the carriage or proper disposition of dead bodies, and contracts for the delivery of messages concerning death" are given as examples of the types of contract the breach of which likely might result in "serious emotional disturbance," and the contract provisions alleged by the Plaintiff Homeowners here are not of this morbid nature.  Reading further, however, this Court finds the last sentence of the comment to be remarkably applicable:

> Breach of other types of contracts, <u>resulting for example in sudden impoverishment or bankruptcy</u>, may by chance cause even more severe emotional disturbance, but, <u>if the contract is</u> not <u>one where this was a particularly likely risk</u>, there is no recovery for such disturbance.

Restatement (Second) of Contracts § 353 cmt. a (1981) (emphasis added).  The first illustration that follows this comment would not allow recovery for "emotional disturbance" even though "A" contracts to build a house for "B," "A" knows that "B" is in a precarious state of health and "proper completion of the work is of great importance" to ["B"], and "["A"'s] delays and departures from specifications" causes "B" to suffer "nervousness and emotional

distress." Id. § 353 cmt. a, illus. 1. The circumstances between the Lender Defendants and the Plaintiff Homeowners in the case at bar, though, differs significantly. The statutory framework that governs their financial relationship presumes the possibility, indeed probability, of borrower default and subsequent foreclosure. To encourage reputable mortgagee banks to nevertheless make loans to these low-to-moderate income borrowers, HUD, through its insured mortgage program, promises to make the lender whole in the event of default. To protect itself, HUD requires that the lender first engage in loss mitigation efforts in advance of filing a claim. But for the insurance program, a typical bank, such as Defendant Bank of America, might not make a loan to a borrower in the same financial circumstance as Plaintiffs Sinclair or Straughn. And while HUD makes the lender whole in the case of default, it takes no protective steps with respect to the mortgagor homeowner. Indeed, especially in an instance, as alleged here, when loss mitigation efforts have not occurred as required, a homeowner very likely may find himself "in sudden impoverishment or bankruptcy." It is this "particularly likely risk" that prompts us to rule that a claim for damages as a result of "emotional distress" (doc. 12 ¶ 120) on the facts alleged in the First Amended Complaint survives a Rule 12(b)(6) motion to dismiss.

### C. Breach of Fiduciary Duty

Plaintiffs' third claim for relief asserts that the

-23-

Lender Defendants have a fiduciary duty "to properly process the paperwork that they submitted for loss mitigation options" (First Amended Complaint ¶115, doc. 12 at 19). Plaintiffs aver that they "reasonably relied upon [the Lender Defendants'] expertise in servicing FHA insured mortgages" (id. ¶ 117, doc. 12 at 20), and that the Lender Defendants "failed to process the[ir] paperwork . . . and engaged in a series of unreasonable and arbitrary actions harming [them]" (id. ¶ 118). The Lender Defendants maintain that, as a matter of law, they do not stand in the shoes of a fiduciary toward the Plaintiff Homeowners and thus their claim must be dismissed.

Both parties agree that, under Ohio law, the relationship between a debtor and creditor is typically not fiduciary in nature. Umbaugh Pole Building Co. v. Scott, 58 Ohio St. 2d 282, 286, 390 N.E.2d 320, 323 (1979). Even when advice is rendered from creditor to debtor, if the parties are operating at arm's length and aiming to protect their individual commercial interests, their relationship remains a business one. Id. at 287, 390 N.E.2d at 323. But when a bank gives advice to a loan customer, the bank may assume the role of its customer's fiduciary. Stone v. Davis, 66 Ohio St. 2d 74, 78, 419 N.E.2d 1094, 1098 (1981). In Stone, plaintiffs came to their savings and loan "as a young married couple, apparently encountering the complex loan process for the first time in their lives. Undoubtedly, their every action in

-24-

assisting the expeditious processing of their loan was guided by [their loan] officers . . ., upon whom they justifiably relied as experts in the field of loan processing." Id. at 79, 419 N.E.2d at 1098. The Ohio Supreme Court recognized that, with respect to advice about how to purchase mortgage insurance, "banks do not act as disinterested experts. . ., but instead have a direct pecuniary interest in inducing the customer to procure it." Id. at 79, 419 N.E.2d at 1098.

We agree that Plaintiffs cannot unilaterally turn the Lender Defendants into a fiduciary simply by reposing trust in them. See, e.g., Cairns v. Ohio Savings Bank, 109 Ohio App. 3d 644, 649, 672 N.E.2d 1058, 1062 (1996). But we find that Plaintiffs have pled adequate facts from which a plausible claim for breach of fiduciary duty could obtain. As in Stone, the homeowners before us, of low-to-moderate income status, can be presumed to be as unsophisticated as the young, married couple "encountering the complex loan process for the first time in their lives." See Stone, 66 Ohio St. 2d at 79, 419 N.E.2d at 1098. Plaintiffs have alleged an extensive regulatory scheme with regard to the FHA Loss Mitigation Program (First Amended Complaint ¶¶ 23-48, doc. 12 at 5-9) and that, as an approved mortgagee (id. ¶ 26, doc. 12 at 6), the Lender Defendants can be presumed to have extensive knowledge of the details of the Program or risk loss of HUD-approval or imposition of monetary fines. See 24 C.F.R. §

203.500.  Like the bank in <u>Stone</u>, the Lender Defendants would seem to have a clear monetary interest in meeting the requirements of the Program as they are subject to sanction for any failure to comply.   In this regard, Plaintiffs allege that the Lender Defendants are required to certify annually to HUD their compliance with the Program (First Amended Complaint ¶ 49, doc. 12 at 9).   In sum, it is clear that Ohio law requires a fact-specific inquiry to determine whether a purported business relationship has evolved into a fiduciary one.   That prescription precludes this Court from ruling in the Lender Defendants' favor on their motion directed to the pleadings pursuant to Rule 12(b)(6).

### D. Breach of Covenant of Good Faith and Fair Dealing

Plaintiffs' fourth claim for relief asserts that the Lender Defendants have "a duty of good faith and fair dealing implied in every note and mortgage contract that neither party to the contracts shall do anything which will have the effect of destroying or injuring the right of the other party to receive the benefit of their contract" (First Amended Complaint ¶ 122, doc. 12 at 20) and that they breached their duty "by not promptly and reasonably evaluating [the homeowners] for their eligibility under the relevant HUD-FHA regulations, handbooks, and mortgagee letters" (<u>id.</u> ¶ 123).  Consistent with their motion to dismiss the Plaintiff Homeowners' breach of contract claim, the Lender Defendants concomitantly urge dismissal of this  claim, too.

The authorities cited by the parties establish that a claim for breach of the implied covenant of good faith and fair dealing cannot be asserted in the absence of a claim for breach of contract. It is not an independent action, but rather inextricably connected with the contract on which it is based. See, e.g., Wendy's International, Inc. v. Saverin, 337 Fed. App'x 471 (6th Cir. 2009). The Lender Defendants offer no authority, other than this premise, as to why the Plaintiff Homeowners' good faith and fair dealing claim should be dismissed. But as detailed in Part III.B of this Opinion and Order, we reject the Lender Defendants' contention that the Plaintiff Homeowners' breach of contract claim cannot proceed; in turn, therefore, we also reject their motion to dismiss the ancillary claim for breach of the covenant of good faith and fair dealing.

### E. Infliction of Emotional Distress

Plaintiffs' fifth claim for relief asserts that the Lender Defendants "improperly serviced [the homeowners'] loans in a manner that caused emotional distress by . . . by ignoring FHA mandatory guidelines, providing inconsistent information to them, failing to explain available options, evaluating FHA Loss Mitigation in such an untimely manner that they lost potential options, failing to inform them what options [the Lender Defendants] were considering, [and] accelerating the mortgage loan . . . and filing foreclosure without considering the FHA Loss

-27-

Mitigation guidelines (First Amended Complaint ¶ 127, doc. 12 at 21). We agree with the Lender Defendants that, as a matter of law, despite the leniency with which we are to review the pleadings at this early stage of the litigation (see Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)), the homeowners' claim for emotional distress cannot survive under Ohio law.[9]

The Ohio Supreme Court recognized the tort of intentional infliction of serious emotional distress in Yeager v. Local Union 20, 6 Ohio St. 3d 369, 374-75, 453 N.E.2d 666, 671 (1983). Based on its reading of Yeager, the Sixth Circuit reduced the standard into these four elements: "(1) defendants intended to cause emotional distress, or knew or should have known that their actions would result in plaintiff's serious emotional distress, (2) defendants' conduct was extreme and outrageous, (3) defendants' actions proximately caused plaintiff's emotional injury, and (4) plaintiff suffered serious emotional anguish." Miller v. Currie,

---

[9]Our finding that the Plaintiff Homeowners' tort claim for infliction of emotional distress is insufficient as a matter of law is not at odds with our ruling (see Part III.B of this Opinion and Order) that they may seek damages for emotional disturbance under their breach of contract claim. There is no "absolute statement of law that plaintiffs must show exactly the same level of emotional harm to recover under theories of intentional infliction of emotional distress and serious emotional disturbance as a result of a breach of [] contract." Stockdale v. Baba, 153 Ohio App. 3d 712, 735-36, 795 N.E.2d 727, 745 (2003). We found here, as the court did there, that "it was implied that a breach of this particular contract would result in serious emotional disturbance to the aggrieved party or parties." Id. at 736, 795 N.E.2d at 745 (emphasis added).

50 F.3d 373, 377 (6th Cir. 1995)(citations omitted)(emphasis added). Judge Cohn, sitting by designation and writing for the panel, further noted that it is "well accepted" that emotional distress claims "may entirely appropriately be dealt with on summary judgment or in a motion to dismiss. Id. at 377-78 (citing Rogers v. Targot Telemarketing Services, 70 Ohio App. 3d 689, 691, 695-96, 591 N.E.2d 1332, 1333, 1335-36 (1990) (emphasis added)).

As our emphasis above highlights, it is the second element of the standard on which this Court believes it must focus. Much of the Plaintiff Homeowners' memorandum in opposition (doc. 35 at 18-19) concentrates on their position that they have pled adequately the necessary fourth element of "serious emotional anguish." See Miller, 50 F.3d at 377. Yet regardless of the amount and type of emotional distress pled,[10] without an allegation

---

[10]Homeowners urge us to follow the ruling of Chief Judge Dlott in Ponder v. Bank of America, N.A., Case No. 1:10-CV-00081 (S.D. Ohio Mar. 8, 2011) in which she denied the lender defendants' Rule 12(b)(1) motion to dismiss the plaintiff homeowners' claim for intentional infliction of emotional distress. Careful reading of Judge Dlott's order, however, makes clear that her focus, unlike ours, was the lender defendants' choice to "take issue specifically with the [plaintiff homeowners'] allegations of serious emotional anguish." Id. at 12. She found specifically that the plaintiff homeowners' "allegations of 'severe humiliation, distress, depression, and anxiety' provides sufficient detail to survive a motion to dismiss. [The lender d]efendants' argument with regard to the severity of [the p]laintiff [homeowner]s' emotion[al] distress requires the Court to make determinations of fact not appropriate for resolution at the pleading stage." Id. at 13. Because we believe that the Plaintiff Homeowners before us, as a matter of law, cannot plead adequately the second element of an emotional distress claim on the factual allegations we must accept as true,

-29-

of conduct that, as a matter of law, is extreme and outrageous,
Plaintiffs' claim must be dismissed.

In Yeager, the Ohio Supreme Court articulated the essence
of "extreme and outrageous" conduct:

> It has not been enough that the defendant has acted
> with an intent which is tortious or even criminal, or
> that he has intended to inflict emotional distress, or
> even that his conduct has been characterized by 'malice,'
> or a degree of aggravation which would entitle the
> plaintiff to punitive damages for another tort.
> Liability has been found only where the conduct has been
> so outrageous in character, and so extreme in degree, as
> to go beyond all possible bounds of decency, and to be
> regarded as atrocious, and utterly intolerable in a
> civilized community. Generally, the case is one in which
> the recitation of the facts to an average member of the
> community would arouse his resentment against the actor,
> and lead him to exclaim, 'Outrageous!'

6 Ohio St. 3d at 374-75, 453 N.E.2d at 671 (quoting Restatement
(Second) of Torts § 46(1) cmt. d (1965)). Applying this authority,
we conclude that improper servicing of the homeowners' loans, even
in violation of mandatory FHA guidelines regarding loss mitigation,
is not the set of facts that "to an average member of the community
would arouse his resentment against the actor, and lead him to
exclaim, 'Outrageous!'" 6 Ohio St. 3d at 375, 453 N.E.2d at 671.
Even in these difficult financial times, a failure to offer loan
mitigation options is not, as a matter of law, conduct "so extreme
in degree, as to go beyond all possible bounds of decency, and to
be regarded as atrocious, and utterly intolerable in a civilized

---

we need not reach the issue on which Judge Dlott ruled, namely
whether the fourth element is met.

community." Id.  See Wells Fargo Bank, N.A. v. Favino, 2011 WL
1256771 (N.D. Ohio Mar. 31, 2011) (claim for emotional distress
dismissed at pleading stage when homeowner alleges, after entering
into loan modification agreement, lender refused additional
mitigation options required by FHA policy when his subsequent job
loss precluded his ability to continue to make required
renegotiated payments).  Accordingly, Rule 12(b)(6) requires
dismissal of Plaintiff's claim for infliction of emotional
distress.[11]

### IV. Conclusion

In sum, for the reasons detailed above, the Court GRANTS
the Government Defendant's motion to dismiss in the lead Sinclair
case (doc. 24), which necessarily resolves, in like fashion, the
motion to dismiss homeowners' cross-claim filed before
consolidation and left pending in the Evans case (doc. 29, No:
1:11-CV-00079)(see footnote 4).  With respect to the motion to
dismiss filed by the Lender Defendants in the lead Sinclair case
(doc. 22), the Court GRANTS their motion to dismiss as to the first
(denial of due process) and the fifth (infliction of emotional
distress) claims for relief but DENIES their motion to dismiss as

---

[11]Our ruling similarly grants the Lender Defendants' pending
motion to dismiss the infliction of emotional distress
counterclaim filed by homeowners in the Evans case (doc. 5, No:
1:11-CV-00079) before it was consolidated with the lead Sinclair
case (doc. 31, No: 1:11-CV-00079), as the question presented is
identical.

to the second (breach of contract), the third (breach of fiduciary duty), and the fourth (breach of the covenant of good faith and fair dealing) claims.  These rulings necessarily resolve, in like fashion, the motion to dismiss the homeowners' counterclaims filed before consolidation and left pending in the Evans case (doc. 5, No: 1:11-CV-0079)(see footnotes 6 and 11).

 SO ORDERED.

Dated: 11/4/11

 S. Arthur Spiegel
 United States Senior District Judge